United States District Court for the
Eastern District of Pennsylvania

------------------------------------------------------------------------x
                                              :

| | |
|---|---|
| C. SCOTT HISEY, STEPHAN AND CAROL GAMMARINO, : | |
| CHUCK UPLINGER, DAVID CRASTNOPOL, | |
|  JOE AND CINDY STEIN, : | CIVIL ACTION |
| JOHN AND MARIANNE HARKINS, : | NO. 2:11-cv-02604-EL |
| DEAN AND LISA KNAUSS, : | |
| JOHN AND TRACY MCNALLY, : | |
| SALVATORE FIORE, KEN GAWASON, : | JURY TRIAL DEMANDED |
| STEPHEN HUESSER, JOHN ROSHELLI, GERALD | |
| NAVE, CRAIG AND CINDY VEVERKA, : | |
| DEAN AND CHRISTA VAGNOZZI, : | |
| TIMOTHY AND BARBARA CURRAN, and : | |
| MICHAEL AND KATRINA KILGALLON : | |

Plaintiffs, :

v. :

NOVA FINANCIAL HOLDINGS, INC., BRIAN M. :
HARTLINE, BALLAMOR CAPITAL MANAGEMENT, :
BARRY R. BEKKEDAM, and THE KEYSTONE EQUITIES :
GROUP
                Defendants. :
------------------------------------------------------------------------x

## FIRST AMENDED COMPLAINT

Plaintiffs C. Scott Hisey, Stephan & Carol Gammarino, Chuck Uplinger, David

Crastnopol, Joe and Cindy Stein, John and Marianne Harkins, Dean and Lisa Knauss, John and

Tracy McNally, Salvatore Fiore, Ken Gawson, Stephen Huesser, John Roshelli, Gerald Nave,

Craig and Cindy Veverka, Dean and Christa Vagnozzi, Timothy and Barbara Curran, and

Michael and Katrina Kilgallon (collectively "Investors"), by and through their undersigned

counsel, hereby file this First Amended Complaint against Defendants NOVA Financial

Holdings, Inc. ("NOVA"), Brian M. Hartline, Ballamor Capital Management ("Ballamor"),

Barry R. Bekkedam and The Keystone Equities Group ("Keystone"), and allege as follows:

## PARTIES

1.      Plaintiff C. Scott Hisey is an adult individual residing at 818 Hidden Forest Dr.,

Collegeville, PA 19426-1243.

2.      Plaintiffs Stephen and Carol Gammarino are adult individuals residing at 270

Lincoln Road, King of Prussia, PA 19406.

3.      Plaintiff Chuck Uplinger is an adult individual residing at 320 Constance Drive,

P.O. Box 2024, Warminster, PA 18974.

4.      Plaintiff David Crastnopol is an adult individual residing at 3850 Ruckman Way,

Doylestown, PA 18902.

5.      Plaintiffs Joe and Cindy Stein are adult individuals residing at 158 Bayberry

Drive, Limerick, PA  19468.

6.      Plaintiffs John and Marianne Harkins are adult individuals residing at 222

Larrimore Lane, Erdenheim, PA  19038.

7.      Plaintiffs Dean and Lisa Knauss are adult individuals residing at 1802 Raptor

Drive, Audubon, PA  19403.

8.      Plaintiffs John and Tracy McNally are adult individuals residing at 1001 Redtail

Road, Audubon, PA  19403.

9.      Plaintiff Salvatore Fiore is an adult individual residing at 1010 Hunter Lane,

Swarthmore, PA  19081.

10.     Plaintiff Ken Gawson is an adult individual residing at 27 Imperial Court,

Monroe, NJ  08831-2163.

9016007v.1

11.     Plaintiff Stephen Huesser is an adult individual residing at 12 Horseshoe Lane, Mullica Hill, NJ 08062.

12.     Plaintiff John Roshelli is an adult individual residing at 1834 Morgan Lane, Collegeville, PA  19426.

13.     Plaintiff Gerald Nave is an adult individual residing at 2808 Breckenridge Blvd., Norristown, PA 19403.

14.     Plaintiffs Craig and Cindy Veverka are adult individuals residing at 3911 Landis Road, Collegeville, PA  19426.

15.     Plaintiffs Dean and Christa Vagnozzi are adult individuals residing at 114 Ithan Lane, Collegeville, PA  19426.

16.     Plaintiffs Timothy and Barbara Curran are adult individuals residing at 504 Tawnberry Lane, Collegville, PA  19426.

17.     Plaintiffs Michael and Katrina Kilgallon are adult individuals residing at 13 Deep Pond Drive, Spring City, PA 19475.

18.     Defendant NOVA is a Pennsylvania corporation and a registered bank holding company, having its principal place of business at 1235 Westlakes Drive, Suite 420, Berwyn, PA 19312.  NOVA acted as issuer of its common stock through a series of private placement memorandums in 2008 - 2009.

19.     Defendant Keystone is a Pennsylvania Corporation and a registered NASD broker-dealer, having its principal place of business at 1003 B Egypt Road, Oaks, PA 19456-1155.  Keystone acted as placement agent for NOVA.

9016007v.1

20.     Defendant Ballamor is a Pennsylvania Corporation and a registered investment advisor, having its principal place of business at 24 Louella Ct, Suite 100, Wayne, PA 19087. Ballamor acted as a stock promoter on behalf of NOVA in 2008 – 2009.

21.     Defendant Barry R. Bekkedam is an adult individual residing at 7320 SE Medalist Pl., Hobe Sound, FL  33455.  Bekkedam was the former Chairman of the Board of NOVA and the Founder, Chairman and Chief Executive Officer of Ballamor.  Bekkedam acted as a stock promoter on behalf of NOVA in 2008-2009.

22.     Defendant Brian M. Hartline is an adult individual and the President and CEO of NOVA, residing at 36 Windward Court, Collegeville, PA  19426.  Hartline acted as a stock promoter on behalf of NOVA in 2008-2009.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and under 15 U.S.C. § 77a et. seq., (Securities Act of 1933) and 15 U.S.C. § 78a et. seq. (Securities Exchange Act of 1934), as amended.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## CONDITIONAL PURCHASE OF NOVA COMMON STOCK

25.     In 2008, NOVA employed Keystone as the exclusive placement agent to raise capital for NOVA from  members of the public through the sale of shares of NOVA's common stock in blocks of 5,000 shares at $11 per share pursuant to Rule 501 of Regulation D promulgated under the Securities Act of 1933.

-4-

26.     Keystone, Ballamor, NOVA's President, Hartline, and NOVA's former Chairman, Bekkedam, all acted as NOVA's stock promoters to sell NOVA's common stock.

27.     The Investors were customers of Delaware Valley Financial Group ("DVFG"), who were referred by DVFG to NOVA as potential investors in NOVA.

28.     Hartline and Bekkedam personally solicited all the Investors to purchase common stock in NOVA during a series of meetings, lunches and dinners that took place in 2008 and 2009.

29.     Hartline and NOVA usually acted in tandem and gave each of the Investors the impression that they jointly spoke for NOVA.

30.     Bekkedam and Hartline told the Investors on many occasions in 2008 and 2009 that  NOVA wanted to use $2.8 million of the capital to be raised as part of the offering for NOVA's proposed merger with DVFG.

31.     DVFG is an insurance and wealth management company located in Conshohocken, PA.

32.     The Investors were all customers of DVFG who were familiar with DVFG and who sought to invest in DVFG through NOVA.

33.     Cognizant that all the Investors were interested in investing in DVFG, Hartline and Bekkedam assured each investor before any of the Investors executed a subscription agreement with NOVA that their investments would be contingent on the DVFG merger closing.

34.     In 2008 and 2009, each investor executed a subscription agreement with NOVA and provided funds to Keystone ranging from $55,000 to $350,000, each based on representations by Hartline and Bekkedam that their investment was conditioned upon the closing of the proposed merger between NOVA and DVFG.

35.    The statements of Hartline and Bekkedam were material inducements to each Investors' decision to invest.

36.    None of the Investors would have purchased shares in NOVA without the investment being conditioned upon the closing of the merger with DVFG.

**EXPRESS TERMS OF THE SUBSCRIPTION AGREEMENTS**

37.    Keystone was required to deposit the Investors' subscription payments in an escrow account maintained at NOVA Bank.

38.    The subscription agreements referred to the escrow account as the "Keystone-NOVA Financial Escrow", which was to be controlled by Keystone.

39.    The subscription agreements executed by the Investors and the private placement memorandum referenced therein ("Offering Materials") provided that the offering terminated on August 29, 2008.

40.    The subscription agreements expressly provided that any subscriptions received after the termination date of August 29, 2008 or received and not accepted prior to August 29, 2008 would be returned in full to the Investors.

41.    The subscription agreements also provided that the closing for the subscriptions could not take place later than five (5) business days after the end of the offering period of August 29, 2008.

42.    None of the Investors' subscriptions were accepted and/or closed within five (5) business days from the expiration of the offering period.

43.    Keystone and NOVA failed to return the Investors' funds as required by the clear terms of the subscription agreements.

44.    Keystone and NOVA did not terminate the offering.

45.     The Offering Materials permitted NOVA to extend the offering period by one or more 30-day periods after August 29, 2008.  However, the subscription agreements stated that no provisions in the agreements shall be "waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought."

46.     Neither NOVA nor Keystone ever sent notice to the Investors that the offering period of August 29, 2008 was being extended.

47.     Neither NOVA nor Keystone ever sent amendments and/or updates of the Offering Materials to the Investors.

48.     Neither NOVA nor Keystone ever sent reconfirmation offers to any of the Investors.

49.     None of the Investors executed any writing agreeing to the extension of the August 29, 2008 offering period.

50.     The subscription agreements further provided that any subscriptions received but not accepted by NOVA prior August 29, 2008, or received by NOVA after August 29, 2008 would be rejected by NOVA.

51.     None of the Investors' subscriptions were accepted by NOVA by August 29, 2008, and thus, all of the subscriptions were necessarily rejected under the express terms of the subscription agreements prepared by NOVA and Keystone.

52.     In fact, NOVA did not close on the Investors' purchase of Shares and stock certificates were not issued until in or after September of 2009, which was not permitted under the express terms of the subscription agreements.

9016007v.1

## REASON FOR THE DELAY IN CLOSING NOVA/DVFG MERGER

53.     In 2008 and early 2009, the Investors made periodic inquiries as to the status of the NOVA/DVFG merger, and were advised that the merger was not yet approved, but their money was safe in an interest bearing escrow account.

54.     In early 2009, some of the Investors demanded confirmation of the oral assurances Hartline and Bekkedam made since each investor signed a subscription agreement and was tendered a private placement memorandum which <u>did not contain</u> the key condition the Investors relied on.  The subscription agreements also falsely stated that the Investors had not relied on any representation outside the private placement memorandums.  All defendants knew from the beginning that the integration clause and other similar clauses in the private placement memorandums were not true.

55.     For instance, the proposed NOVA/DVFG merger was referenced on page 13 of the May 29, 2008, Private Placement Memorandum titled "Contingencies", and stated:

> We have entered into a non-binding letter of intent to purchase DVFG Inc. ("DVFG"), and continue to undertake due diligence on the company.  We have not executed a definitive agreement to acquire DVFG, and there is no guarantee that we will do so. Moreover, if we do execute a definitive purchase agreement to acquire DVFG, there is no guarantee that we will be able to complete the acquisition in a timely fashion, or on terms as favorable to the Company as currently contemplated, if at all.  We tentatively expect to use a combination of cash and common shares as consideration in the DVFG Acquisition, including a maximum of $2.8 million of cash consideration.

This statement was false and was always known to be false by all defendants.  In fact, all the Investors' investments were always known by all defendants to be explicitly conditioned on the closing of the NOVA/DVFG merger.

56.     Consequently, on or about April 17, 2009, to put the minds of the Investors at ease and to correct inaccuracies in the offering materials, Hartline, on behalf of NOVA, sent a

letter to the Investors in which he reconfirmed what Hartline and Bekkedam promised earlier: Each investment was contingent upon the closing of the DVFG merger.

57.     The title of Hartline's letter, attached hereto as Exhibit "A", is "NOVA Financial Holdings, Inc. (NOVA) and Delaware Valley Financial Group Inc. (DVFG) merger progress report."

58.     In the letter, Hartline advised the Investors that NOVA "signed a Definitive Agreement on March 6, 2009, in which NOVA will acquire DVFG and DVFG will become an insurance and brokerage arm of NOVA."

59.     Hartline further advised that "[i]n accordance with the subscription Agreement signed by you as an investor, any funds delivered to NOVA in connection with your potential share purchase are being and will continue to be held in an interest bearing escrow account earning 1.0% until our merger closes."

60.     Hartline's letter clearly and unambiguously states that the Investors' money would be returned unless the merger of NOVA and DVFG closed.

61.     Thus, under the terms of the investment as clarified by Hartline's letter, NOVA could not gain access to the Investors' subscriptions being held in escrow – over $1,000,000 – until the merger with DVFG closed.  By September, 2009, the DVFG merger still had not closed.

### RELEASE OF MONEY FROM ESCROW DESPITE
### NOVA'S FAILURE TO MERGE WITH DVFG

62.     In need of money, but still unable to finalize the merger with DVFG, NOVA was determined to eliminate the condition that the money be kept in escrow until the DVFG merger closed.

63.     Hartline and Bekkedam called for another meeting with the Investors.  Hartline and Bekkedam appeared at the meeting held at DVFG's office in Conshohocken, PA on

September 21, 2009 in order to convince the Investors to allow NOVA to use the funds being

held in escrow, despite the fact that the merger between NOVA and DVFG was not yet closed.

64.     At the meeting, Bekkedam bragged that he previously raised over $40 million for

NOVA and had access literally to billions of dollars in more capital personally or through his

numerous friends and customers in the ultra high net worth world.  He said he personally would

make sure that each investor received back their money with interest if the DVFG/NOVA merger

did not close.

65.     Hartline attended the meeting with Bekkedam and was present when Bekkedam

made his representations on behalf of NOVA.

66.     After the meeting, Bekkedam wrote a letter to the Investors, dated September 24,

2009, attached hereto as Exhibit "B", re-stating portions of his promise made during the

September 21, 2009 meeting:

> Should the closing with DVFG not occur prior to 3/31/10, we will
> commit to seeking Investors who will replace your capital should
> you not want to remain an investor.  Given the capital already
> invested and committed via Ballamor clients and relationships and
> the bank's "well capitalized" financial condition, we do not
> anticipate this being a problem.

67.     Bekkedam's oral statements made at the meeting on September 21, 2009, and his

letter of September 24, 2009, were material mis-statements intended to induce the Investors to

authorize the release of their money from escrow to NOVA.

68.     The Investors believed that Bekkedam was a director or "owner" of NOVA and

was acting at the direction of NOVA when Bekkedam agreed to return their money if the

DVFG/NOVA merger did not close by March 31, 2010.

9016007v.1

69.     All defendants knew the Investors would not agree to release the funds from escrow without the completion of the DVFG/NOVA merger or assurances that their shares would be repurchased if the merger was not completed.

70.     NOVA obtained over $1 million in capital as a result of Bekkedam, its former Chairman and prolific stock promoter, agreeing to buy back the Investors' shares after March 31, 2010 if the DVFG/NOVA merger did not close.

71.     Upon information and belief, the Investors' money was released from escrow to NOVA sometime after September 24, 2009.

72.     The Investors were issued stock certificates sometime in November, 2009.

73.     The DVFG merger with NOVA never closed.

74.     Bekkedam's financial and business circumstances took a severe reversal after he made his promise to buy back the NOVA stock from the Investors when it came to light that Bekkedam recommended investing in a ponzi scheme in Florida to many of his customers.

75.     Bekkedam soon closed Ballamor, attempted to sell his customer list to a third party, and moved to Florida.

## THE INVESTORS TRIED UNSUCCESSFULLY TO GET NOVA, BALLAMOR AND BEKKEDAM TO HONOR THEIR PROMISES

76.     In early 2010, the Investors made inquiry of Bekkedam and confronted he and Hartline in a meeting about Bekkedam's promise to purchase back their shares.

77.     Bekkedam refused to repurchase the Investors' shares.

78.     Throughout 2010, the Investors made repeated demands upon NOVA through Hartline to repurchase the shares and those demands were likewise refused.

79.     However, NOVA through Hartline made repeated representations to Plaintiffs throughout 2010, including at a meeting on December 1, 2010 at the offices of DVFG, that it was in the process of trying to raise a significant amount of new capital.

80.     NOVA through Hartline lulled Plaintiffs into a false sense of security by representing that if these fund raising efforts were successful then it would consider repurchasing Plaintiffs' shares.

81.     NOVA through Hartline further represented that the commencement of any legal action by Plaintiffs would derail these fund raising efforts.

82.     As a direct result of these representations, Plaintiffs waited to commence the instant lawsuit against Defendants.

83.     But for the above representations upon which Plaintiffs reasonably relied, Plaintiffs would have promptly commenced the instant lawsuit in early 2010 when their demands to have their shares repurchased were denied.

84.     By mid-2010, despite the release of the Investors' money, NOVA was still undercapitalized and came under the scrutiny of federal regulators.

85.     NOVA's capital problems culminated in the execution of a Consent Order with the Federal Deposit Insurance Corporation on May 7, 2010 and an agreement with the Federal Reserve Bank of Philadelphia on July 19, 2010.

86.     The value of the investment, which the Investors never intended to make in the first place, plunged to a fraction of its value.

9016007v.1

## COUNT ONE
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against NOVA, Hartline, Ballamor and Bekkedam)

87.     The investors repeat and reallege the allegations in paragraphs 1 through 86 as if fully set forth herein.

88.     Hartline, acting on behalf of and at the insistence of NOVA, convinced the Investors to purchase shares of NOVA common stock on the express condition that their investment would be contingent on the DVFG merger closing.

89.     The offering materials, however, were false and misleading because they did not reflect this condition.

90.     NOVA intended that the Investors rely, and the Investors did reasonably rely, on each of Hartline's misrepresentations made on behalf of NOVA, and were damaged as a result.

91.     Thereafter, Bekkedam, acting on behalf of and at the insistence of NOVA, Hartline and Ballamor, convinced the Investors to consent to allow their money to be released from escrow, by promising that he would personally repurchase the shares if the DVFG/NOVA merger was not completed.

92.     Bekkedam persuaded the Investors to release their money from escrow using oral and written statements that he knew at the time were false.

93.     Bekkedam failed and refused to honor the terms of his promise and never seriously intended to honor it.

94.     Bekkedam made these intentional misrepresentations to the Investors with the express, implied and/or apparent authority of NOVA, and therefore, NOVA is bound by these statements.

9016007v.1

95.     Further, NOVA ratified the fraudulent acts of Bekkedam by accepting the benefits of his false promises to the investors, namely, accepting the Investors' funds from escrow despite the condition of the investment not being satisfied.

96.     The law does not allow NOVA and Hartline to accept the benefits of the fraudulent conduct that allowed them access to the Investors' funds, and at the same time, avoid liability created by the misrepresentations that induced the investors to act.

97.     The misrepresentations and omissions identified above were made in connection with the sale of securities by NOVA to the Investors, and in so doing, NOVA, Hartline, Ballamor and Bekkedam repeatedly employed the means and instrumentalities of interstate commerce and communication.

98.     Defendants NOVA, Hartline, Ballamor, and Bekkedam acted with *scienter* in making the foregoing misrepresentations.

99.     NOVA, Hartline, Ballamor and Bekkedam intended that the Investors rely, and the Investors did reasonably rely, on each of the Bekkedam's misrepresentations made on behalf of NOVA, Hartline and Ballamor, and were damaged as a result.

100.    The misrepresentations caused NOVA to obtain the Investors' money despite the condition of the investment not being satisfied.

101.    Therefore, NOVA, Hartline, Ballamor and Bekkedam, in connection with the purchase or sale of securities and in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder:

       a)     employed a device, scheme, or artifice to defraud the investor;

-14-

b)      made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c)      engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon the Investors, in connection with the purchase or sale of a security.

102.    NOVA, Hartline, Ballamor and Bekkedam's misrepresentations and omissions, as detailed above, were material.

103.    All of the above acts were in violation of federal law and NOVA, Hartline, Ballamor and Bekkedam are jointly and severally liable to the Investors for damages caused by the violations.

WHEREFORE, the Investors respectfully request this Court enter judgment in their favor and against NOVA, Hartline, Ballamor and Bekkedam, jointly and severally, in an amount to be determined plus interest, attorney fees, expenses of suit, and such other and further relief as this Court deems just and proper.

**COUNT TWO**
**Pennsylvania Securities Act of 1972 Part IV Section 1-401 Sales and Purchases**
**(Against NOVA, Hartline, Ballamor and Bekkedam)**

104.    The Investors repeat and reallege paragraphs 1 through 103 as if fully set forth herein.

105.    NOVA, Hartline, Ballamor and Bekkedam, directly or indirectly, used or employed, in connection with the purchase or sale of NOVA's securities, manipulative or deceptive devices or contrivances, and made untrue statements of material fact and omitted to state material facts necessary to make statements made, in light of the circumstances in which

9016007v.1

they were made, not misleading, and engaged in acts and practices that operate as a fraud and a deceit, in contravention of Pennsylvania law.

106.    Without limitation, NOVA, Hartline, Ballamor and Bekkedam, as alleged above:

a)    employed a device, scheme, or artifice to defraud;

b)    made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and

c)    engaged in acts, practices, and courses of business that operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

107.    NOVA, Hartline, Ballamor and Bekkedam's misrepresentations and omissions, as detailed above, were material.

108.    The Investors' reasonably relied on those misrepresentations and omissions.

109.    The Investors were damaged by the conduct of NOVA, Hartline, Ballamor and Bekkedam.

110.    As a result of these violations, NOVA, Hartline, Ballamor and Bekkedam, and each of them, are jointly and severally liable to the Investors pursuant to the Pennsylvania Act.

WHEREFORE, the Investors respectfully request this Court enter judgment in their favor and against NOVA, Hartline, Ballamor and Bekkedam, jointly and severally, in an amount to be determined, plus interest, attorney fees, expenses, and such other and further relief as this Court deems just and proper.

9016007v.1

**COUNT THREE**
**Control Person Liability Under Sec. 20(a) of the Exchange Act**
**(Against NOVA, Hartline and Ballamor)**

111.     The Investors repeat and reallege the allegations of paragraphs 1 through 110 as if fully set forth herein.

112.     NOVA, Hartline and Ballamor, at the time of the misrepresentations herein alleged, were "persons" who, directly or indirectly, controlled Bekkedam who made primary violations of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated there under.

113.     By virtue of their participation in and/or awareness of Bekkedam's actions and/or intimate knowledge of the misrepresentations made to the Investors by Bekkedam, NOVA, Hartline and Ballamor had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Bekkedam, including the false and misleading statements to the Investors designed to induce the Investors to release funds from escrow to which NOVA otherwise had no right.

114.     In particularly, each of NOVA, Hartline and Ballamor had direct and supervisory involvement in the day-to-day operations of Bekkedam and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

115.     NOVA, Hartline and Ballamor were, in a meaningful sense, culpable participants in Bekkedam's violations.

116.     The culpable participation of NOVA, Hartline and Ballamor included, but was not limited to, both individually and in concert with Bekkedam, misrepresenting that the Investors' shares would be repurchased in the event the merger between NOVA and DVFG was not

-17-

completed for the express purpose of allowing NOVA access to subscription payments held in escrow to which it had no right.

117.   By reason of the conduct alleged herein above, NOVA, Hartline and Ballamor are liable for the conduct of Bekkedam under Section 20a of the Securities Exchange Act of 1934.

118.   As a direct and proximate result of NOVA, Ballamor and Hartline's wrongful conduct, the Investors suffered substantial damages.

WHEREFORE, the Investors respectfully request this Court to enter judgment in their favor and against NOVA, Ballamor and Hartline, jointly and severally in an amount to be determined plus interest, expenses, and such other and further relief as this Court deems just and proper.

## COUNT FOUR
### The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")
### (Against All Defendants)

119.   The Investors repeat and reallege the allegations of paragraphs 1 through 118 as if fully set forth herein.

120.   THE UTPCPL provides that: "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss ... as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act."

121.   The Investors were purchasers of securities for personal purposes within the meaning of 73 Pa. C.S.A. §§ 201-9.2.

122.   Defendants used and employed unfair or deceptive acts or practices within the meaning of the UTPCPL as described in detail above.

9016007v.1

123.    Defendants' actions as set forth above constitute unfair or deceptive practices under the UTPCPL, which unfair or deceptive acts or practices had the effect of creating confusion and misunderstanding on the part of the Investors.

124.    Defendants' actions as set forth above occurred in connection with the sale of securities and are actionable under the UTPCPL.

125.    Each defendant either directly and/or by their acquiescence in accepting the benefits of their conduct committed unfair and deceptive acts and practices against the Investors.

126.    As a result of defendants' conduct, the Investors sustained substantial damages because the Investors were tricked into making an investment to which they never agreed or wanted.

127.    The Investors are entitled to an award of attorneys fees, penalties and treble damages pursuant to 73 P.S. §201-9.2

WHEREFORE, the Investors demand that judgment be entered in their favor and against Defendants, jointly and severally, for compensatory damages, together with interest, penalties, treble damages, costs of suit, counsel fees and such other relief as this Court deems just, proper and equitable.

### COUNT FIVE
### Breach of Contract
### (Against NOVA, Ballamor and Bekkedam)

128.    The Investors repeat and reallege the allegations of paragraphs 1 through 127 as if fully set forth herein.

129.    Ballamor and Bekkedam entered into an oral contract to repurchase the Investors' shares in NOVA at the meeting that took place at DVFG's offices on September 21, 2009.

-19-

130.    The oral contact was partially confirmed by Bekkedam's letter of September 24, 2009.

131.    The contract was supported by adequate consideration because, upon information and belief, Bekkedam benefitted financially as a result of the money being released to NOVA.

132.    Bekkedam breached the contract by failing to repurchase the Investors' shares despite demand.

133.    NOVA and Bekkedam are liable for Bekkedam's breach of contract as Bekkedam had the express, implied and/or apparent authority to act on behalf of NOVA and Ballamor.

134.    Further, NOVA was fully informed of the promises and representations made by Bekkedam that induced the Investors to release the funds from escrow.

135.    NOVA did not object to Bekkedam's contract with the Investors.  Rather, NOVA knowingly acquiesced and accepted the benefits of the conduct of its stock promoter, Bekkedam. In doing so, the law is clear that NOVA ratified the contract and is liable to the Investors for its breach.

136.    The Investors were damaged as a result of NOVA, Bekkedam and Ballamor's breach.

WHEREFORE, the Investors respectfully request this Court to enter judgment in their favor and against NOVA, Ballamor and Bekkedam, jointly and severally, in an amount to be determined at trial plus interest, expenses, and such other and further relief as this Court deems just and proper.

9016007v.1

## COUNT SIX
### (Breach of Subscription Agreements against NOVA and Keystone)

137.    The Investors repeat and reallege the allegations of paragraphs 1 through 136 as if fully set forth herein.

138.    Nova and Keystone prepared and issued offering materials to each investor, including a Private Placement Offering and subscription agreement.

139.    The subscription agreements provided that the Investors' funds being held in escrow by Keystone would be returned at the end of the offering period if the subscriptions were not accepted by Nova and/or closings did not take place within five (5) days of the end of the offering period of August 29, 2008.

140.    Nova did not accept and/or close on the Shares within the time prescribed by the subscription agreements.

141.    Keystone was obligated under the subscription agreements to return the monies held in escrow to the Investors, which was not done.

142.    Keystone and NOVA were obligated under the Offering Materials to terminate the offering, which was not done.

143.    While the Offering Materials permitted Keystone and NOVA to extend the August 29, 2008 termination date, this was never done.

144.    Keystone and NOVA never advised the Investors that the offering period was being extended;  the Investors never signed any writing agreeing to any such extension; and reconfirmation offers were never sent to the Investors.

145.    Keystone and NOVA breached their respective obligations under the Offering Materials by, among other things, not refunding the Investors subscriptions when the Shares did

not close within five (5) days of the offering period, and by improperly extending the offering period without notice to and/or the written consent of the Investors.

146.    After breaching the agreement, Nova acting through Hartline, sent a letter on April 24, 2009 purporting to modify the Offering Materials by making the offering contingent on the closing of the DVFG merger – the very condition NOVA used to fraudulently induce the investors to subscribe in the first place.

147.    The purported modification was not agreed to in writing by the Investors as required by the subscription agreements.

148.    NOVA also breached any modified agreement by accepting the funds from escrow despite the failure of the DVFG merger to close.

149.    NOVA then sought to modify the modified agreement through its agent and stock promoter, Bekkedam, by promising the Investors that Bekkedam would repurchase the Shares in the event the merger with DVFG failed to close in exchange for the Investors agreeing to release the funds from escrow.

150.    NOVA provided no new consideration to support this purported modified agreement.

151.    Regardless, NOVA is bound by the actions of Bekkedam as the latter had express, implied or apparent authority to act on behalf of NOVA. Alternatively, NOVA ratified Bekkedam's promises by virtue of having accepted the benefits of those promises.

152.    NOVA breached this purported agreement when it and its agent Bekkedam refused to repurchase the shares when the merger failed to gain regulatory approval.

153.    Keystone breached its responsibilities as escrow agent under the Offering Materials by releasing the monies from escrow without the written consent of the Investors.

-22-

9016007v.1

154.     The Investors have at all times complied with their contractual obligations under the subscription agreements as well as any modification thereto.

155.     As a direct and proximate result of the above contractual breaches, the Investors have sustained damages in the amount of their respective subscription payments.

WHEREFORE, the Investors respectfully request this Court to enter judgment in its favor and against Defendants NOVA and Keystone, jointly and severally, in an amount to be determined at trial, interest, expenses, and such other and further relief as this Court deems just and proper.

## COUNT SEVEN
### Violations of Rule 10b-9 and Rule 15c2-4
### (Against NOVA, Keystone and Hartline)

156.     The Investors repeat and reallege the allegations in paragraphs 1 through 155 as if fully set forth herein.

157.     The offering by NOVA and Keystone was done pursuant to Rule 501 of Regulation D promulgated under the Securities Act of 1933.

158.     The Offering was a contingent offering, and thus, is subject to the requirements of Rule 10b-9 and Rule 15c2-4.

159.     NOVA, Hartline and Keystone all knew or should have known that the offering was conditioned on the completion of the DVFG merger.

160.     Keystone accepted, deposited and held the Investors' subscriptions in escrow well after the expiration of the offering period, knowing that the funds could not be released until the condition of the investments had been satisfied.

161.     The offering period terminated on August 29, 2008 pursuant to the clear terms of the Offering Materials .

9016007v.1

162.   The condition of the investment was not satisfied at the end of the offering period.

163.   The offering was not extended in writing by Keystone or NOVA, nor were reconfirmation offers sent to the Investors.

164.   Instead, NOVA and Keystone continued the offering and the Investors' subscriptions remained in escrow after the expiration of the offering period.

165.   Keystone did not release the funds from escrow until after NOVA, acting through its agent Bekkedam, fraudulently induced the Investors to release the funds based upon guarantees that the shares would be repurchased in the event the merger did not close.

166.   The foregoing facts establish that NOVA, Hartline and Keystone committed fraudulent, deceptive, or manipulative acts or practices in violation of Rule 10b-9 and Rule 15c2-4.

167.   Specifically, NOVA, Hartline and Keystone individually and/or acting in concert with each other, violated Rule 10b-9 and 15c2-4 by, among other things:

a)   failing to maintain the Investors' funds in an escrow account maintained at an independent bank;

b)   failing to transmit the funds to a bank which agreed in writing to hold all such funds in escrow for the persons who have the beneficial interests therein and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency occurred;

c)   failing to return the Investors' money at the end of the offering period when the stated condition did not occur;

c)   failing to terminate the offering when the stated condition did not occur by the end of the offering period;

d)      failing to provide amendments to and/or supplementation of the Offering Materials to the Investors concerning any extensions of the offering period specifically or changes to the Offering Materials generally;

e)      failing to provide reconfirmation offers to the Investors prior to the expiration of the offering period so that the Investors could affirmatively elect whether to continue their investment after the offering period terminated or have their subscriptions returned; and

f)      releasing the Investors' funds from escrow to NOVA without the condition of the investment having been satisfied.

168.      As a direct and proximate result of the above violations, the Investors sustained substantial losses.

WHEREFORE, the Investors respectfully request this Court to enter judgment in its favor and against Defendants NOVA, Hartline and Keystone in an amount to be determined at trial, punitive damages, interest, attorney fees, expenses, and such other and further relief as this Court deems just and proper.

## COUNT EIGHT
### Unjust Enrichment Against NOVA

169.      The Investors repeat and reallege the allegations in paragraphs 1 through 168 as if fully set forth herein.

170.      The Investors invested in NOVA on the express condition that the proposed merger between NOVA and DVFG be completed.

171.      NOVA knew and acknowledged that this was the only reason the Investors agreed to execute the subscription agreement and to deliver the subscription payment to Keystone for the purpose of holding those funds in escrow pending the completion of the merger.

-25-

172.     The Investors agreed to release the monies from escrow despite the non

occurrence of the condition based upon assurances and guarantees from NOVA's second largest

shareholder, and former Chairman in the presence of NOVA's current President and CEO, Brian

Hartline.

173.     The merger never came to fruition and the assurances and promises given to the

Investors were not honored.

174.     Thus, the Investors are shareholders of NOVA without the condition of their

investment ever having been satisfied.

175.     NOVA gained access to and the benefit of the Investors' funds for which it knew

were only intended for use in the event of a successful merger between it and DVFG.

176.     The Investors demanded a return of those funds when it learned that the merger

failed to gain regulatory approval.

177.     NOVA has wrongfully refused to repurchase the shares from the Investors.

178.     The retention of such monies under the circumstances described above

would be unjust and inequitable.

WHEREFORE, the Investors respectfully request this Court to enter judgment

in its favor and against Defendant NOVA in an amount to be determined at trial, interest,

expenses, and such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Wherefore, the Investors pray from each Defendant, jointly and severally, as follows:

(a)    Damages in an amount of the Investors' subscription payments;

(b)    Recovery of all of the Investors' attorney's fees, expert witness fees, costs and disbursements of suit;

(c)    Pre-judgment and post-judgment interest at the maximum rate provided by law;

(d)    Exemplary damages from each Defendant;

(e)    Treble damages under the UTPCPL; and

(f)    Such other and further relief to which the Investors are deemed entitled by the jury.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues.

WHITE AND WILLIAMS LLP


BY:      /s/ Justin E. Proper
         Michael N. Onufrak
         Justin E. Proper
         Identification No(s). 43064/202701
         1800 One Liberty Place
         Philadelphia, PA  19103-7395
         215.864.7174/7164
         onufrakm@whiteandwilliams.com
         properj@whiteandwilliams.com
DATED:  March 26, 2012                Attorneys for Plaintiffs

# EXHIBIT "A"

 

**NOVA Financial Holdings, Inc. (NOVA) and Delaware Valley Financial Group Inc. (DVFG) merger progress report.**
April 17, 2009

Dear Potential Shareholders:

We would like to take this opportunity to provide an update on NOVA and the status of our merger plans with DVFG. The companies signed a Definitive Agreement on March 6, 2009, in which NOVA will acquire DVFG and DVFG will become an insurance and brokerage arm of NOVA.

NOVA has filed the necessary applications requesting regulatory approval of the merger transaction with the State Banking Department and FDIC and based upon the application filing dates and the normal regulatory approval time-frame, our expected closing date will be in the late second to early third quarter of 2009.

In accordance with the Subscription Agreement signed by you as an investor, any funds delivered to NOVA in connection with your potential share purchase are being and will continue to be held in an interest bearing escrow account earning 1.0% until our merger closes.

In anticipation of our merger with DVFG, NOVA has signed an exclusive agreement with DVFG to provide its insurance and broker dealer services to our clients, effective May 1, 2009, and we have terminated our existing agreement with our current provider.

**NOVA highlights:**

NOVA was successful in raising approximately $14 million of common equity and $6 million of debt securities during our 2008 capital raise, at a time when the financial industry was experiencing difficulties

NOVA utilized the proceeds to complete two acquisitions; an Asset Based Lending Group and Pennsylvania Business Bank, a $110 million, four branch community bank headquartered in Philadelphia PA. The acquisition of the Asset Based Lending Group had a positive impact to earnings, and provided NOVA with another product to offer its growing customer base. The Pennsylvania Business Bank acquisition was a key strategic objective and allowed NOVA to continue to grow its franchise and expand our operations into the State of New Jersey without the regulatory burdens and related costs.

**Financial Highlights:**

- Total assets surpassed $650 million, increasing $155 million or 30.7% during 2008. The PBB acquisition contributed $110 million of total asset growth.
- Total loans approximated $410 million, an increase of $138 million or 50.7% during 2008. The PBB acquisition contributed $86 million of the total loan growth.
- Total deposits approximated $500 million, increasing $155 million or 45.1% during 2008. The PBB acquisition contributed $97 million of the total deposit growth.
- NOVA was on pace to achieve positive earnings in excess of $500,000 for 2008. Unfortunately, as a result of the severe downturn in the economy that affected the financial industry worldwide, the Company was required to write down two loan relationships and one investment in the amount of $3.3 million. We also increased our loan loss provision to a level that management determined to be adequate for potential future loan losses.
- During the first quarter of 2009, NOVA returned to positive earnings despite the continuing troubled economic environment. We are encouraged about our future and our profitability as many of our large bank competitors are facing significant difficulties, providing us with an excellent opportunity to continue to gain market share in the Philadelphia area.

In closing, we are so optimistic about our future that we have launched a 2009 capital raising campaign to raise approximately $19 million of common equity capital. A portion of the proceeds will be used to fund two acquisitions - DVFG and AFC First Financial, a niche finance company (energy lending) located in Allentown, PA. The majority of the proceeds will be retained by the bank in anticipation of the growth from the above acquisitions and our ability to gain market share in these current economic conditions.

If you have any questions please feel free to contact us.

Brian Hartline
President and CEO
NOVA Financial Holdings, Inc.
(610)993-4160

Tom Schirmer and Marc Smith
DVFG Advisors
125 East Elm Street
Conshohocken, PA 19428
(610)234-0500

*The forgoing material may contain forward-looking statements. We caution that such statements may be subject to a number of uncertainties and actual results could differ materially. Therefore readers should not place undue reliance on any forward-looking statements. NOVA Financial Holdings, Inc. does not undertake, and specifically disclaims, any obligation to publicly release the results of any revisions that may be made to any forward-looking statements to reflect the occurrence of anticipated or unanticipated events or circumstances after the date of such statements.*

# EXHIBIT "B"





September 24, 2009

Dear Investors in the NOVA/DVFG Transaction:

We are very excited that progress is being made toward the anticipated closing of the Nova Bank and DVFG merger. As we have discussed previously, our timing was delayed given the recent economic events and ensuing regulatory environment.

Although the precise timing is still subject to the regulators, the bank has and is in process of fulfilling all of its capital requirements ensuring a well capitalized status and providing it with the financial strength to execute on our unified vision. Ballamor's clients and relationships infused $5 million into the bank in June and have signed term sheets for an additional $13 million. Nova was also granted TARP of $13.5 million which is inexpensive capital we can utilize but will not hesitate to pay off should regulatory pressure associated with it become difficult.

We appreciate your continued interest and willingness to invest in the near term, which further ensures probability of a closing sooner rather than later. Ballamor is committed as well, having assisted the bank in obtaining investments and commitments of more than $40 million. Should the closing with DVFG not occur prior to 3/31/10, we will commit to seeking investors who will replace your capital should you not want to remain an investor. Given the capital already invested and committed via Ballamor clients and relationships and the bank's "well capitalized" financial condition, we do not anticipate this being a problem.

Both management teams have not wavered in their willingness and excitement about this transaction.

Once again thank you for your confidence and we look forward to being back on track.

Sincerely,

Barry R. Bekkedam
Chairman and CEO

BRB:wk

## CERTIFICATE OF SERVICE

I, Justin E. Proper, Esquire, hereby certify that on March 26, 2012, the foregoing First

Amended Complaint was filed electronically and is available for viewing and downloading from

the ECF System and was also served electronically upon the following counsel:

> Ryan E. Borneman, Esquire
> Matthew A. Taylor, Esquire
> James L. Beausoleil, Jr., Esquire
> Duane Morris LLP
> 30 South 17th Street
> Philadelphia, PA 19103
>
> Ernest Edward Badway, Esquire
> Fox Rothschild LLP
> 100 Park Avenue, Suite 1500
> New York, NY 10017
>
> Joshua Horn, Esquire
> Fox Rothschild O'Brien & Frankel LLP
> 2000 Market Street, 10th Floor
> Philadelphia, PA 19103
>
> Frank J. Rizzo, III, Esquire
> 715 St. Francis Drive
> Broomall, PA 19008

> /s/ Justin E. Proper
> Justin E. Proper